# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

JIMILIE M. DUVAL,                     §
                                      §
             *Plaintiff*,             §
                                      §
*versus*                              §     CIVIL ACTION NO. 6:13-495
                                      §
CAROLYN W. COLVIN,                    §
Acting Commissioner of                §
Social Security,                      §
                                      §
             *Defendant*.             §

## REPORT AND RECOMMENDATION

Jimilie M. Duval ("Duval") seeks review of an adverse decision on her applications for disability-based benefits under the Social Security Act.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance.  *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II.  Background

Duval is a sympathetic figure.  Born in 1972, she had 3 childhood surgeries on a cleft palate, and afterward received both speech therapy and program services for "educable mentally retarded" while in school.  She spent most of her childhood in foster care where she was sexually/physically/emotionally abused.  She and her siblings were adopted when she was 10 years old.  She now is the mother of three young children.  She lost custody of her two older children in 2000, due to her boyfriend's abuse of drugs.  She, too, has had past issues with substance abuse (marijuana) in 2002-2003.  (T. 404).  She stopped working in 2007 when she had a third child.  She currently is raising one son alone, and absent a vast improvement in her circumstances, one is hard pressed to discern how she will manage well without familial or societal welfare.

Duval applied for disability insurance benefits and supplemental security income due to learning disability, anxiety, and depression commencing October 8, 2007.  (T. 145, 149, 193).[1]  An evidentiary hearing was held before an administrative law judge, Thomas P. Tielens ("ALJ Tielens").  (T. 13, 26-60).  Duval attended and testified.  (*Id.*).  Also testifying as a witness was Constance Renfer, a friend.  (*Id.*).

ALJ Tielens denied Duval's applications on June 9, 2011.  (T. 13-21).  The Appeals Council denied Duval's request to review.  (T. 1-4).  This rendered ALJ Tielens's opinion a final decision.   Duval then instituted this proceeding.

---

[1]      "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 6).

# III. Commissioner's Decision

ALJ Tielens utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act.[2]  At Step 2, ALJ Tielens found that Pokluda suffers from major depressive disorder, anxiety, and post-traumatic stress disorder ("PTSD") that are "severe impairments." (T. 15).[3]  Because none of these impairments are presumptively disabling under 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"), ALJ Tielens determined Duval's "residual functional capacity."[4]  He found that she retains capacity to perform a full range of work at all exertional levels, but her nonexertional (mental) limitations restrict her to only low stress work involving simple, routine and repetitive tasks.  (T. 17).

ALJ Tielens next found at Step 4 that Duval can perform her past relevant work as a companion and food service worker because those jobs were low stress work involving simple, routine and repetitive tasks not precluded by her current

---

[2]  The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[3]  The medical evidence contained references to asthma.  ALJ Tielens declined to find Duval's asthma as a severe impairment.  (T. 15-16). Duval does not complain of this or any of ALJ Tielens's Step 2 findings.

[4]  "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain.  *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (July 2, 1996).  Regarding mental impairments, an administrative law judge must take into consideration limitations on a claimant's "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting ...." *See* 20 C.F.R. §§ 404.1545(c), 416.945(c).

residual functional capacity. (T. 20). Duval thus failed to carry her burden to prove a *prima facie* case of disability,[5] and her claim was denied. (T. 21).[6]

## IV. Points of Alleged Error

Duval's brief presents five "questions" quoted verbatim in the note below.[7] Restated as points of error, and reordered for analytical clarity, these questions translate to the following:

1. ALJ Tielens erred in establishing an alleged onset-of-disability date on October 8, 2007.

2. ALJ Tielens failed to develop the evidentiary record adequately by not ordering a consultative intelligence examination.

3. ALJ Tielens failed to apply correct principles of law when weighing medical evidence by not applying factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c).

---

[5]     *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

[6]     ALJ Tielens made an alternative Step 5 finding that Duval can still perform alternative and available work. (T. 20). He found that Duval's nonexertional limitations have little or no erosive effect on her occupational base of unskilled work. (T. 20-21). Thus, ALJ Tielens concluded, under the framework of Medical-Vocational Guidelines, section 204.00, a finding of "not disabled" would be appropriate even if Duval were unable to perform past relevant work. (T. 20-21). Duval does not directly challenge this Step 5 finding.

[7]     1.     Is the decision of the ALJ supported by substantial evidence?

2.     Does the ALJ commit reversible error by failing to properly utilize the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing the weight to be given to the opinion evidence?

3.     Did the ALJ fail to adequately develop the record by not referring the Plaintiff for an I.Q. test?

4.     Did the ALJ properly consider and implement the factors set forth in 20 C.F.R. §§ 404.1529 and 416.929 in assessing the credibility of the Plaintiff?

5.     Does the ALJ commit reversible error in citing evidence in the record, that predated the amended onset date in the plaintiff's memorandum? Did the ALJ Commit Error in failing to further amend the Plaintiff's onset date to March 8, 2010?

(Dkt. No. 10, p. ii, 3-24).

4. ALJ Tielens failed to apply correct principles of law when weighing credibility of subjective testimony by not applying factors set forth in 20 C.F.R. §§ 404.1529 and 416.929; and,

5. ALJ Tielens's factual findings are not supported by substantial evidence.

In response, the Commissioner argues that ALJ Tielens employed correct legal principles and that his factual findings are supported by substantial evidence. (Dkt. No. 11, pp. 5-18).

# V. Discussion and Analysis

Duval's first and second points of error (as restated above) are threshold issues. If ALJ Tielens evaluated the wrong or incorrect disability period (point 1), the case must be remanded without consideration of whether correct principles of law were applied or whether the factual findings are supported by substantial evidence. Similarly, if ALJ Tielens failed to develop the evidentiary record adequately (point 2), judicial review of specific findings and conclusions made on an incomplete record would be pointless. Consequently, these two issues must be addressed first.

## A. *Disability Onset Date*

When individuals apply for disability-based benefits under the Social Security Act, they state on their applications an "onset date," *i.e.*, the first day they allege they became unable to perform substantial gainful activity. The onset date is important because it potentially governs the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits. *See* SSR 83-20, TITLES II AND XVI:

ONSET OF DISABILITY, 1983 WL 31249, at *1 (S.S.A. 1983).[8]  Consequently, it is essential that an onset date be established correctly and supported by the evidence.  *Id.*

ALJ Tielens evaluated Duval's claim for a discrete period commencing October 8, 2007, through the date of his decision.  When so doing, he considered the disability onset date alleged by Duval in her applications.  (T. 13, 21, 145, 149).  Duval contends that ALJ Tielens erred by failing to amend that date to either February 19, 2009 or March 8, 2010 (both being *later* in time than the date originally claimed).  Duval argues that ALJ Tielens failed to determine an appropriate onset date based on specific medical evidence in accordance with requirements of SSR 83-20.  (Dkt. No. 10, pp. 5-6, 22-23).

The onset date that Duval actually advocates as being correct is unclear.  At various times, Duval suggested four alternative dates, *i.e.*, February 11, 2009, February 19, 2009, March 8, 2010, and October 8, 2010.  (Dkt. No. 10, pp. 6, 22-23, 24).  Also unclear is exactly *why* Duval tactically desires to have a later onset date than she originally alleged.  Since her medical records reflect little or no

---

[8]    SSR 83-20 explains how the onset date impacts Title II and Title XVI claimants as follows:

> In title II cases, disability insurance benefits (DIB) may be paid for as many as 12 months before the month an application is filed. Therefore, the earlier the onset date is set, the longer is the period of disability and the greater the protection received.

> Under title XVI, there is no retroactivity of payment. Supplemental security income (SSI) payments are prorated for the first month for which eligibility is established after application and after a period of ineligibility. Therefore, except for certain cases of aliens where an exact onset date of disability must be determined for eligibility purposes, the only instances when the specific date of onset must be separately determined for a title XVI case is when the onset is subsequent to the date of filing or when it is necessary to determine whether the duration requirement is met.

SSR 83-20, 1983 WL 31249, at *1.

evidence supporting a disability claim prior to 2010, perhaps she believed she would have a greater chance of success if ALJ Tielens considered only more recent evidence favoring her application.

Duval's argument that ALJ Tielens erred in not amending the alleged onset disability date is unpersuasive for multiple reasons. Procedurally, the point is waived. Despite having announced an intention to move to amend,[9] Duval never made that request during the April 25, 2011, hearing or at any time before ALJ Tielens rendered his decision on June 9, 2011. (T. 26-60). Duval, although represented by an attorney, did not object at the hearing to admission of medical record exhibits pertaining to years prior to 2010. (T. 28-29).[10] Thus, ALJ Tielens reasonably considered the onset date originally alleged and evidence pertaining to it.

There was no substantive error in any event. Duval cites no case, and the court's independent research discloses none, holding that the Commissioner reversibly errs when evaluating a claim for a period of disability alleged by a claimant in her application, or for a period commencing *earlier* than advocated at an evidentiary hearing. Moreover, specific requirements of SSR 83-20 for determining an onset date for mental disabilities apply only *after* the Commissioner first determines that a claimant is disabled. *Baladi v. Barnhart*, 33 Fed App'x 562, 564 (2d Cir. 2002) (summary order); *Small v. Astrue*, No. 3:11–cv–933 (GLS), 2012 WL 5966580, at *3 n.5 (N.D.N.Y. Nov. 28, 2012) ("Determination of onset date, however, presupposes a finding of disability.").

---

[9]     In a 22-page "pre-hearing" memorandum to ALJ Tielens dated April 18, 2011, Duval's attorney indicated his intent to amend Duval's alleged onset date to February 11, 2009, at the evidentiary hearing. (T. 229).

[10]     Absent a showing of coercion or deceit, an attorney's conduct is imputed to a claimant. *See Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010).

And, even when SSR 83-20 does govern, "[a]s long as the onset date . . . [is] . . . deemed to be prior to the date of application, . . . there . . . [is] . . . no need to determine the onset date more precisely." *Baladi*, 33 Fed App'x at 564.

Finally, Duval demonstrates no harm emanating from use of an alleged onset date that she originally proffered. ALJ Tielens received and considered evidence relating to the entire period from October 8, 2007, through the date of his decision. Had Duval presented persuasive evidence of disability commencing *at any time* during this period, ALJ Tielens would have been obliged to grant her application. Then, it would have been necessary to determine a more precise onset date. But, since ALJ Tielens found that none of Duval's evidence demonstrated disability, Duval was not prejudiced by an evaluation of her claim for a longer period than she apparently preferred.

B.    *Consultative Intelligence Examination*

Duval argues that ALJ Tielens failed to develop the record adequately by not ordering a consultative intelligence examination. (Dkt. No. 10, pp. 15, 17-18). According to Duval, evidence in the record indicated she has limited intellectual functioning; thus, ALJ Tielens should have secured an intelligence quotient ("IQ") test before making his determination concerning mental residual functional capacity. (*Id.*, p. 18).

A consultative examination is used to "try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on the claim. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). The decision to obtain a consultative examination is made on a case-by-case basis at the discretion of the Commissioner. *See* 20 C.F.R. §§ 404.1517, 404.1519–19b, 416.917, 416.919–19b. "It can be reversible error for an ALJ not to order a consultative examination when an examination is required

for an informed decision." *Tankisi v. Commissioner of Soc. Sec.*, 521 Fed. App'x 29, 32 (2d Cir. 2013) (summary order). "However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Id.* (citing *Lefever v. Astrue*, 5:07–cv–622 (NAM/DEP), 2010 WL 3909487, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd,* 443 Fed. App'x 608 (2d Cir. 2011)).

Here, the record does not support Duval's argument that an intelligence examination was necessary for an informed decision. Although consultative psychological examiner, Dr. Jeanne A. Shapiro, Ph.D., estimated Duval's intellectual functioning as being possibly borderline (she assessed "rule out borderline intellectual functioning"), she concluded, nonetheless, that Duval retains capacity to understand and follow simple instructions and directions, and perform simple and some complex tasks with supervision and independently. (T. 355).

Duval passed a general educational development ("GED") test in 1990,[11] and she attended some college and vocational training for a certified nurse's aide in 1994. (T. 30, 169, 194, 224, 403). Her treating psychiatrist, Dr. Raslaan Nizar, M.D., opined that Duval does *not* have a low IQ or reduced intellectual functioning. (T. 435). In routine medical examinations, Duval denied any impairments or barriers to learning. (T. 385). Duval is able to manage all of her personal and daily living needs independently, raise her son alone, and get along with friends and family. (T. 355).

Finally, Duval's cognitive limitations, if any, are accommodated in ALJ Tielens's assessment of her residual functional capacity: ALJ Tielens limited

---

[11]     General Educational Development ("GED")tests are a group of subject tests which, when passed, certify that the test taker has high school-level academic skills.  Generally, States award a Certificate of High School Equivalency or similarly titled credential to persons who meet the passing score requirements.

Duval to performing "work involving simple, routine and repetitive tasks." (T. 17). In sum, the record does not suggest any mental limitation requiring a consultative intelligence examination in order to make an informed decision.

## C.    *Residual Functional Capacity*

Administrative law judges must make credibility assessments, that is, decide how much weight to give various pieces of evidence. Duval's points of error 3 and 4 assert that ALJ Tielens erred when weighing medical and subjective evidence. These errors, according to Duval, resulted in a legally-flawed and incorrect assessment of her mental residual functional capacity.

With respect to each point, Duval argues that ALJ Tielens failed to consider and apply factors prescribed in the Commissioner's regulations for judging credibility. Duval correctly identifies special rules that govern credibility choices in social security proceedings. And, as a general matter, an administrative law judge's disregard of such factors would be error. Duly promulgated administrative regulations have the force of law and are binding on the Commissioner and the courts.[12]

### 1.    Weighing Medical Opinion

ALJ Tielens considered opinion evidence from four medical sources. Purnachandra R. Popuri, M.D., and Rasaan Nizar, M.D., respectively, were Duval's primary care and psychiatric care treating physicians. Jeanne Shapiro,

---

[12]    Substantive regulations are binding on federal courts when authorized by and consistent with the statute they implement, properly promulgated, and "not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §§ 706(2)(A), (C); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96(1979); *Batterton v. Francis*, 432 U.S. 416, 425 (1977); *De Jesus v. Perales*, 770 F.2d 316, 327 (2d Cir. 1985), *cert. denied*, 478 U.S. 1007 (1986).

Ph.D. and Dr. L. Blackwell[13] were, respectively, a consultative psychological examiner (who performed a psychiatric examination of Duval), and a state agency nonexamining physician consultant (who expressed an opinion based on a review of medical record evidence, including the psychiatric evaluation of Dr. Shapiro).

### a. Governing Law

A "treating physician rule" requires administrative law judges to give controlling weight to opinions of treating physicians regarding the nature and severity of claimants' impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). But, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007) (summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Also, treating source opinion that lacks underlying expertise,[14] or that is brief, conclusory and unsupported by clinical findings,[15] or appears overly sympathetic

---

[13]    Dr. Blackwell's precise academic and professional credentials are not reflected in the record; instead, the record only indicates "psychology" after his name. ALJ Tielens, however, refers to him as a "State agency medical consultant" and "qualified physician" without objection from Duval. (T. 19).

[14]    *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6-7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

[15]    *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006).

such that objective impartiality is doubtful and goal-oriented advocacy is reasonably suspected, can be rejected.[16]

When controlling weight is *not* given, an administrative judge must consider certain regulatory factors to determine how much weight, if any, to give such an opinion: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that supports a treating physician's report; (4) how consistent a treating physician's opinion is with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

These same six factors also apply when evaluating opinion evidence from non-treating medical or other sources. See SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006) ("Although the factors in 20 C.F.R. §§ 404.1527[c] and 416.927[c] explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.' ").

### b. *Medical Opinion Evidence*

The opinions given in this case by medical sources are summarized succinctly and chronologically as follows:

---

[16] *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

### i.    Purnachandra R. Popuri, M.D.

Treatment notes dated March and April 2010, from Duval's primary care physician, Dr. Popuri, reflect that Duval complained of feeling depressed and anxious. (T. 379-80). Dr. Popuri reported that Duval received "good benefit" from an anti-depressant (Lexapro) in the past, and she was placed on a low dosage. (T. 380). It was further noted that she had an appointment to see a psychiatrist regarding depression. (T. 379). At that time, Dr. Popuri opined that Duval could not work because of depression and anxiety. (T. 381-82).

In September 2010, Dr. Popuri further opined that Duval could not work because of fatigue. (T. 406).

### ii.    Jeanne Shapiro, Ph.D.

Dr. Shapiro, a consultative psychologist, examined Duval on April 8, 2010. (T. 352-56). At that time, Duval reported that she was not receiving any mental health treatment, but that counseling would begin in one week. (T. 352). She noted her medication as Lexapro. (T. 353). Dr. Shapiro's mental status examination revealed that Duval's manner of relating, social skills, and overall presentation were adequate. (T. 354). Her demeanor and responsiveness to questions was cooperative. (*Id*.). She was appropriately dressed, eye contact was appropriate, personal hygiene and grooming were good, and gait, posture, and motor behavior were all normal. (*Id*.). Duval was fully oriented, her sensorium and through processes were coherent and goal directed. (*Id*.). Her attention and concentration were intact, and she was able to do counting, simple calculations, and serial threes. (*Id*.). Her remote memory skills were intact. (*Id*.). Her cognitive functioning was estimated to be in the borderline range,

with a general fund of knowledge appearing to be below average. (T. 355). Duval reported her activities of daily living as being able to dress, bathe, and groom herself. (*Id*.). She can cook , prepare food, do general cleaning, laundry, shopping, manage money (although she claimed that she was not good with savings and checking accounts), takes public transportation, does not drive, and gets along with family and friends. (*Id*.). She reportedly spends her days doing chores, caring for her son, taking walks, shopping watching television, and listening to music. (*Id*.).

Dr. Shapiro assessed that psychiatric symptoms may interfere with Duval's functioning at times. (T. 355). "However, it is important to note that she reports that she is able to manage all personal and daily living needs independently, to raise her son alone, and to get along well with friends and family." (*Id*.). Dr. Shapiro diagnosed her with "Depressive Disorder NOS; Panic [D]isorder; R/O Borderline Intellectual Functioning; R/O Dependent Personality Disorder; Anemia, asthma, and sciatica." (*Id*.).

Dr. Shapiro provided the following opinion:

Vocationally, the claimant appears to be capable of understanding and following simple instructions and directions. She appears to be capable of performing simple and some complex tasks with supervision and independently although she may not always feel motivated to do so. She appears to be capable of maintaining attention and concentration for tasks. She can regularly attend to a routine and maintain a schedule. She appears to be capable of learning some new tasks. She appears to be capable of making some appropriate decisions. She appears to be able to relate to and interact moderately well with others. She appears to have considerable difficulty adequately dealing with stress.

(T. 355).

### iii. Dr. L. Blackwell

On April 12, 2010, a state agency nonexamining psychological consultant, Dr. L. Blackwell, opined in a Psychiatric Review Technique form that Duval has no limitations in activities of daily living, mild limitations in social functioning, moderate limitations in concentration, persistence, or pace, and never any episodes of deterioration. (T. 367). Dr. Blackwell also completed a Mental Residual Functional Capacity Assessment, noting four moderate limitations (ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to respond appropriately to changes in the work setting) out of twenty mental activities. (T. 371-72).[17]

### iv. Rasaan Nizar, M.D.

In December 2010, Dr. Nizar, a psychiatrist with Madison County Mental Health Department, conducted a psychiatric assessment. (T. 421-23). Dr. Nizar diagnosed Duval with PTSD with "depressive disorder, not otherwise specified, and rule out bipolar disorder; and, personality disorder, borderline features." (T. 423). At that time, her global assessment of functioning was rated at 50. (*Id*.).[18]

---

[17] "Moderately Limited" means only that a claimant's capacity is impaired; it does not indicate the degree and extent of the limitation. *See* Program Operations Manual System (POMS) DI 24510.060, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424510060 (April 3, 2014); *see also Jones v. Commissioner of Soc. Sec.*, 478 Fed. App'x 610, 612 (11th Cir. 2012).

[18] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008)(citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders [DSM-IV] 32 (4th ed. 2000)). "A GAF in the range of 41 to 50 indicates '[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).'" *Zabala*, 595 F.3d at 406 n.2 (citing DSM-IV, at 34).

In March 2011, Dr. Nizar completed a Mental Impairment Questionnaire, opining that Duval's mental abilities and aptitudes to do unskilled work were *seriously limited, but not precluded* in her ability to maintain regular attendance and be punctual, complete a normal workday, and deal with normal work stress. (T. 434). He further opined that she had a *limited but satisfactory* ability to get along with co-workers or peers and respond appropriately to changes in a routine work setting. (*Id.*). In all other areas, Duval was noted to be *unlimited or very good.* (*Id.*). He rated her functional limitations in activities of daily living and concentration, persistence, or pace as none or mild. (T. 436). Social functioning was rated as moderate. (*Id.*). Dr. Nizar further opined that she would have one or two repeated episodes of decompensation within a 12-month period. (*Id.*). He estimated that she would miss work about four days per month due to her impairment. (*Id.*). Finally, Dr. Nizar indicated that Duval could manage benefits in her best interests. (T. 437).

### c.  *ALJ Tielens's Weighting of Medical Opinion Evidence*

ALJ Tielens gave *little weight* to opinions of treating physicians Popuri and Nizar, citing their failure to explain a basis for their conclusions. (T. 19). ALJ Tielens gave Dr. Shapiro's opinions *some* weight because objective medical evidence supports her opinion, and because she had the benefit of examining Duval. (T. 18). He gave Dr. Blackwell's opinion *significant weight*, finding that he is a qualified physician who reviewed the entire record and is familiar with social security regulations. (T. 19). ALJ Tielens found Dr. Blackwell's opinions also to be consistent with the medical evidence of record. (*Id.*).

### d.  Duval's Challenge

Treating physician opinions were more favorable to Duval than opinions of the consulting medical sources.  ALJ Tielens, however, gave treating source opinions little weight, while affording greater weight to opinions of the consulting medical sources.  Duval argues that this was error, specifically in failing to apply the six-factor analysis prescribed by regulation.  Duval also objects strenuously to greater weighting of consulting-source evidence over more favorable treating-source evidence.

### e.  Application

Duval correctly points out that ALJ Tielens did not articulate findings on all six regulatory factors with respect to every medical opinion.  The fact that a factor was not expressly *mentioned*, however, does not mean necessarily that it was not *considered*.[19]  To draw such a conclusion here would be especially inappropriate because ALJ Tielens expressly cited all relevant regulations and rulings concerning weighting of medical and other evidence:

> The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

(T. 17).  This recitation documents his awareness of and intent to apply correct legal principles.

Omission of an explicit six-factor analysis is not a ground for an automatic remand.  *See Halloran*, 362 F.3d at 31–32.  Administrative law judges need not

---

[19]  *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

mechanically recite each factor, but rather must only "appl[y] the substance of the treating physician rule." *Id.* at 32; *see also Petrie v. Astrue*, 412 Fed. App'x 401, 407 (2d Cir. 2011) (an administrative law judge need not expressly go through each factor in his decision, so long as it is "clear from the record as a whole that the ALJ properly considered" them).[20]

Here, ALJ Tielens's decision reflects that he applied the substance of the governing regulation. He discounted treating physician opinions for a relevant reason expressly listed in that regulation, *i.e.*, no supporting evidence (Factor 2). Duval points to no evidence concerning other regulatory factors that would trump or outweigh ALJ Tielens's reason for not giving more weight to treating physician opinion.[21]

Conversely, the reasons given by ALJ Tielens for affording more weight to consultative medical opinions are expressly included among the six regulatory factors. Dr. Shapiro's opinions were given *some* weight because objective medical evidence supports her opinion (Factor 4) and she had the benefit of

---

[20]    *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. § 404.1527(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear"); *see also Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed"); *see also Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence submitted.") (internal quotations and citation omitted); *see* SSR 06-03p, 2006 WL 2329939, at *6 (stating that the ALJ should explain the weight given to "other source" opinions, "or otherwise ensure that the ... decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case").

[21]    Duval could have argued that Dr. Nizar's opinion was entitled to more weight based on his degree of specialization as a psychiatrist (Factor 5), but additional reasons would have supported ALJ Tielens's decision to give Dr. Nizar's undocumented opinions little weight. Dr. Nizar saw Duval only twice, such that neither length of the treatment relationship and frequency of examination (Factor 1) nor nature and extent of the treatment relationship (Factor 2) would argue for giving the opinion more weight.

actually examining Duval (Factor 6). (T. 18). Similarly, ALJ Tielens gave Dr. Blackwell's opinion *significant weight*, finding that he is a qualified physician who reviewed the comprehensive, longitudinal medical record and is familiar with the social security regulations (Factors 5 and 6). (T. 19). Also, his opinions were consistent with medical evidence of record (Factor 4). (*Id.*).

Because there is no requirement to recite and discuss each and every factor slavishly, and because ALJ Tielens proffered clear explanations for his credibility choices consistent with the regulation and governing circuit law, there is no error in his weighting of medical opinion evidence. There also is no *per se* error in choosing to weight consultative medical opinion over treating physician opinion. *See, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (reports of consultative and/or non-examining physicians may override opinions of treating physicians, provided they are supported by substantial evidence in the record).

2.    Weighing Subjective Testimony

Duval testified that she was on probation in 2006 for collecting unemployment from a job she had been fired from while working at another job. (T. 35). Duval testified that she makes mistakes when she gets stressed out. (T. 37). When she worked in food service, she worked the lines at meal time and/or cleaned the dining room afterward. (T. 40). She left that job to find something less stressful and physically demanding. (*Id.*). She did not have the speed they needed for production at meal time and would "freeze up." (*Id.*). She cannot multi-task, claiming that when she cooks she must continually watch her food or it will burn. (T. 41). She cannot keep track of money. (T. 42). Her attendance at work was poor because she had a lot of "call ins" for being sick or tired. (T. 43). However, she held a factory job for four months without having

"call ins" because "she had a lot of debt at that time" and "was trying to pay off things, that was the only reason for that." (T. 45). She can only read very simple things, and does not retain knowledge. (T. 47). She cannot stick with something for eight hours a day because she is not focused. (*Id*.). She takes medicine for depression but still has mood swings and racing thoughts. (T. 49-50). Depression for her is an everyday thing. (T. 51) When things get really bad, she isolates herself or takes a "time out" that lasts 15 minutes or more than half a day. (T. 51). She does not sleep well because of anxiety. (T. 58). She has a severe fear of medication because when she was a child she swallowed an entire bottle of aspirin. (T. 59).[22]

### a.    *Governing Law*

The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable. On the other hand, such testimony is subjective and may be colored by a claimant's interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must, in addition, present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged. *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96–7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July

---

[22]    Ms. Renfer, a friend, testified that she saw Duval only two or three times in 2010. (T. 53). When Duval lived closer, she saw her more frequently, and took her to places such as the doctor's office, the Social Security board, and/or her job. (*Id*.). On one occasion she witnessed Duval having a "breakdown" when she could not handle the stress of her baby, her baby's father rejecting her and the baby, and her baby's father not wanting to take responsibility. (T. 54).

2, 1996); SSR 96–4p, Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations, 61 Fed. Reg. 34488–01, 34489, 1996 WL 362210 (SSA July 2, 1996).

The Commissioner provides explicit guidance for deciding how much weight to give claimants' subjective self-evaluations. First, a formally promulgated regulation requires – once an impairment is identified – consideration of seven objective factors that support or impugn subjective testimony of disabling pain and other symptoms.[23] Not every factor for weighing subjective testimony applies in every case, and "[failure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the administrative law judge's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record." *Judelsohn v. Astrue*, No. 11–CV–388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted).[24]

---

[23] An administrative law judge must evaluate a claimant's symptoms, including pain, based on the medical evidence and other evidence, including the following factors:

(i) claimant's daily activities;
(ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi) measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

[24] *See also Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (stating that the 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) factors are not a rigid, seven-step prerequisite) (citing *Snyder v. Barnhart*, 323 F. Supp.2d 542, 546 (S.D.N.Y. 2004))).

Second, an internal ruling, SSR 96–7p, directs a two-step process:

First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms . . . .

Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96–7, 1996 WL 374186, at *2. This ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96–7, 1996 WL 374186, at *2.

Governing circuit law generally mirrors the Commissioner's Ruling. When an administrative law judge rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).

b.    *Credibility Assessment of Subjective Testimony*

With regard to Duval's credibility, ALJ Tielens concluded:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

(T. 17-18).

### c.     Duval's Challenge to Credibility Assessment

Duval challenges ALJ Tielens's credibility choice with respect to her subjective testimony on a ground very similar to her challenge to ALJ Tielens's weighting of medical opinion, *viz.*, failure to apply regulatory weighting factors. (Dkt. No. 10, p. 19).  Duval also takes issue with ALJ Tielens's finding that Duval has no restrictions with respect to activities of daily living.[25] (*Id.*, p. 20).

Duval alternatively argues that even if substantial evidence supports that finding, it is not indicative of ability to sustain substantial gainful activity. (Dkt. No. 10, p. 21).  According to Duval, none of her activities of daily living were shown to be transferable to performance of substantial gainful activity on a consistent basis; thus, such activities cannot be used to enhance her residual functional capacity. (*Id.*, p. 22).  Duval correctly notes well-settled law that claimants need not be complete invalids to qualify for benefits, and their subjective credibility should not be impugned simply for enduring pain in order to care for themselves.[26]

### d.     Application

ALJ Tielens expressly cited the governing regulations and the interpretive rulings accompanying them.  He also mentioned and described the two-step process mandated by SSR 96-7p. (T. 17-18).  This indicates his awareness of and intent to follow governing legal principles.

---

[25]     ALJ Tielens found that Duval has no restriction in activities of daily living.  (T. 16).  ALJ Tielens noted that Duval cares for her pre-school child on her own as a single parent.  (*Id.*).  He further noted that the record also demonstrates that Duval is able to dress, bath and groom herself on a regular basis.  (*Id.*). In addition, she cooks, cleans, does laundry, shops, manages money, and can take public transportation.  (*Id.*).

[26]     *See e.g. Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *see also Stoesser v. Commissioner of Soc. Sec.*, No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011).

His decision, moreover, reflects that he then considered objective factors listed in the Regulation to the extent there was evidence thereof. Specifically, he summarized the medical evidence regarding her alleged mental impairments. (T. 18-19). That evidence encompassed objective factors pertinent under the regulation. He next engaged in the two-step process as required by the applicable Ruling, and articulated specific reasons for finding Duval's subjective complaints not fully credible, all as required by circuit law.

Under the governing regulation, a claimant's daily activities are relevant to assessing her credibility regarding intensity, persistence and limiting effects of symptoms. Hence, ALJ Tielens acted properly when taking daily activities into account, especially in light of evidence from Dr. Blackwell who opined that Duval has no restriction in activities of daily living. (T. 367). Also, ALJ Tielens did not rely solely on daily activities when making his credibility choice. He also factored in and relied primarily on objective medical findings, another factor expressly relevant under the governing regulation. Indeed, ALJ Tielens provided a lengthy summary of medical observations indicating a lesser level of severity than alleged by Duval. (T. 18-19). There is no legal error in ALJ Tielens's approach to assessing credibility of Duval's subjective testimony, and his credibility choice regarding Duval's self-evaluation of regarding persistence, intensity and limiting effects of her symptoms was not patently unreasonable.[27]

---

[27] *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' ").

D.    *Substantial Evidence*

Duval's substantial evidence point is inextricably entwined with his argument that ALJ Tielens's residual functional capacity determination was flawed by legal errors in the weighting of medical opinion and subjective testimony. Duval infers that because of those legal errors, the Commissioner's ultimate decision cannot be deemed to be supported by substantial evidence. This inference, however, falls under its own weight because analysis above discloses that there were no errors in weighting of medical opinion and subjective testimony.

Otherwise, Duval's substantial evidence point is reduced to an invitation for the court to reweigh evidence *de novo* and come to a different conclusion. This, of course, is beyond a reviewing court's power even if it subjectively agreed with the version advocated by Duval.

More importantly, substantial evidence supports the most decisive finding in this case. Dr. Shapiro and Dr. Blackwell provided evidence consistent with ALJ Tielens's residual functional capacity finding. Duval does not challenge the Step 4 finding that her past relevant work, as actually and generally performed, is low stress work involving only simple, routine and repetitive tasks, and her testimony provides no basis for concluding that such work requires physical or mental capacities exceeding what ALJ Tielens assessed as her current residual functional capacity.

There is no demonstrated substantial evidence error.

## VI.  Recommendation

Duval's request to remand this action should be DENIED. The Commissioner's decision should be AFFIRMED.

## VII.   Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ____4____ day of _____April_____ 2014.

_Earl S. Hines_
Earl S. Hines
United States Magistrate Judge